IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FRANCISCO VEGA SANCHEZ                                              PLAINTIFF

     v.               Civil No.   5:16-cv-05037

SERGEANT McELROY; DEPUTY
KELLEY; CORPORAL SCOTT; CAPTAIN
JEREMY GUYLL; TYRANNY RAY,
Medical Supervisor; and JOHN DOE DEPUTY                             DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  The Plaintiff proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently incarcerated in the United States Penitentiary in Jonesville, Virginia. The events that are the subject of this action occurred while Plaintiff was incarcerated in the Benton County Detention Center (BCDC).  Plaintiff contends his constitutional rights were violated in the following ways:  Sergeant McElroy, Deputy Kelley, and Corporal Scott used excessive force against him; Captain Guyll failed to take action in response to grievances submitted by the Plaintiff; and Nurse Tyranny Ray denied him adequate medical care.

The case is before me on the summary judgment motion (Doc. 45) filed by Nurse Tyranny Ray and the motion for summary judgment (Doc. 48) filed by the Benton County Defendants, Sergeant McElroy, Deputy Kelley, Corporal Scott, and Captain Guyll (the County Defendants).  Plaintiff has responded to the motions (Doc. 57).  The motions are ready for decision.

-1-

AO72A
(Rev. 8/82)

### **1. Background**

Plaintiff was booked into the BCDC on October 13, 2015, on pending criminal charges. *Cty. Defts' Ex.* A-1 at 1-3.[1]  A white warrant was issued on October 14, 2015, for Plaintiff's detention for a parole violation. *Id.* at 4.  His parole was violated on October 15, 2016.  *Cty. Defts' Ex.* B at 18-19.  Plaintiff remained incarcerated at the BCDC until January 21, 2016.  *Cty. Defts' Ex.* A-1 at 11.

Just prior to his arrest, Plaintiff began having a problem with his right ear. *Cty. Defts. Ex.* B at 19-20.  He had difficulty hearing out of it.  *Id.* at 20.

Tyranny Ray is a licensed practical nurse employed by Southern Health Partners (SHP), Inc. *Ray Ex.* 1 at ¶ 2.  At all times relevant to the complaint, SHP was contracted to provide medical services for inmates housed at the BCDC.  *Id.* at ¶ 3.

On December 31, 2015, Plaintiff submitted a medical request asking for his right ear to be checked because he could not "hear nothing out of it." *Cty. Defts' Ex.* A-2 at 16; *Resp.* at ¶ 7.  He also said his right eye was "tearing up irrita[t]ed and burning up" and the right side of his head was "hurting bad." *Id.*  He was seen by Nurse Ray that day.  *Cty. Defts' Ex.* A-2 at 16.

On December 31, 2015, Plaintiff was involved in an altercation in D-pod with another inmate, Kenneth Fisher.[2] *Cty. Defts' Ex.* B at 24.  Deputy Kell was first to notice the altercation and gives this account:

> I just finished gathering trays and had stepped into pod control to get the disinfectant sprayer to spray tables. As I was leaving pod control I noticed a fight in D150 and alerted the other Deputies. I entered D150 along with Deputy Kelley followed by Lieutenant Darner. Deputy Kelley was instructing Inmate Sanchez, Francisco Vega (OCA:31831) to get face down on the floor as I did the same with Inmate Fisher, Kenneth (OCA:0118254). Inmate Fisher laid down and

---

[1] Page references are to the CM/ECF page number.

[2] Corporal Scott identified the inmate who Plaintiff fought with as Inmate White. *Cty. Defts' Ex.* A-3 at 22.

followed our instructions.  However, Inmate Sanchez began resisting Deputy
Kelley as he attempted to gain control of him.  Lieutenant Darner, as well as
Deputy Kelley ordered Inmate Sanchez to stop resisting and lay flat on this
stomach as I stepped over to assist Deputy Kelley.  Inmate Sanchez did not
follow their orders and then tried to stand up.  Lieutenant Darner warned Inmate
Sanchez that if he did not stop resisting then he would be tased.  Inmate Sanchez
still did not follow our orders and continued to resist us.  Lieutenant Darner then
deployed his Taser into the upper portion of Inmate Sanchez's back and
connected the Taser to his lower leg to complete the circuit.  The Taser was used
for a full 5 second cycle.  Lieutenant Darner then ordered Inmate Sanchez to
place his hands behind his back.  I then handcuffed Inmate Sanchez, securing him
at this time.  Other Deputies began to arrive due to the assistance call made by
Lieutenant Darner, and began to secure the rest of the pod.  Deputy Hale,
Corporal Scott, and I escorted Inmate Fisher to E pod to find out the cause of the
incident.  Inmate Fisher was momentarily placed in the ministry room in E pod
until Inmate Sanchez could be secured in E pod and the nurse could check for any
injuries.  I then returned to my duties.

*Cty. Defts' Ex.* A-3 at 20.

Plaintiff makes no claim that excessive force was used against him by any of the named

Defendants in D-pod.  *Cty. Defts' Ex.* B at 26; *Resp.* at ¶ 13.  It is clear from the video that the

Plaintiff attacked the other inmate[3] and was resisting the efforts of the deputies to restrain him.

*Cty. Defts' Ex.* A-4 (video clips from D-pod).

After Plaintiff was medically evaluated, deputies continued to escort him to E-pod.

Deputy Trimmell provides the following account of what occurred then:

he was being verbally abusive stating "that shit f------ tickled", referring to him
being tased.  Deputies Kelley, Banta and I escorted Sanchez into E-102-219 to
the back of the cell and ordered him to get on his knees in order for Deputy
Kelley to take the handcuffs off.  Deputy Kelley ordered Sanchez to place his
hands on the wall as he takes the handcuffs off and not to move until he hears the
door shut.  After Deputy Kelley removed the hand cuffs, Sanchez stated "man I
could do this shit all f------ day".  Sanchez then began to turn off the wall and
stand up.  Deputies Kelley, Banta and I tried to place him back on the wall and
at that same time Sanchez began to actively resist.  We placed him on the floor.

---

[3]In his deposition, Plaintiff admits he was the attacker.  *Cty. Defts' Ex.* B at 25.

-3-

Sanchez then began trying to punch other Deputies.  He then placed his arms under his body.  I tried to gain control of Sanchez's left arm.  Sanchez then tucked his arms beneath him.  I then delivered three knee strikes to Sanchez's left hip. At that time I passed control of Sanchez's left side to Deputy Hale.  At that time I felt that the inmate was secure enough for me to step away and made sure that the other deputies involved were okay.  Once Sanchez was secured he was escorted to booking to be transported to the hospital for further evaluation.  I returned to my duties with no other incident.

*Cty. Defts' Ex.* A-3 at 21.

Corporal Scott gives the following account:

Deputies Kelley and Banta attempted to place him back on the wall, he became very aggressive in his attempt to resist.  Sanchez then swung with a closed fist at multiple deputies, in attempt to place Sanchez on the ground I took control of his right leg he then broke free of my grip on his leg.  Sergeant McElroy then hammer struck Sanchez on the back and torso until he became compliant and went to the ground.  Multiple deputies were then able to gain control of Sanchez and place him in handcuffs.

*Cty. Defts' Ex.* A-3 at 22.

Deputy Kelley gives the following account:

Deputy Banta and I escorted Sanchez up stairs and instructed him to go down to his knees and once the handcuffs were removed to place his hands on the wall and stay there till the door shut due to his aggression from the fight and while being escorted from D pod.  Sanchez complied and was then removed from handcuffs, after being removed from handcuffs Sanchez began to become verbally aggressive, and said, "I'm gonna do this shit all night." Sgt. Mcelroy then asked if Sanchez was done and he immediately stood up and attempted to turn around and swing on Deputy Banta and I.  As we continued to struggle to gain control of Sanchez he began swinging his arms with a closed fist in attempts to hit us.  Sgt. Mcelroy then delivered a hammer fist strike to his lower back in attempts to gain control and place Sanchez on the ground.  Once on the ground Sanchez continued to be non[-]compliant and refused to give us his hands that he placed underneath his body.  Sgt. Mcelroy then gave orders to Sanchez that if he didn't give us his hands he would be tased, Sanchez refused and was drive stunned after the 5 seconds had passed Sanchez then began to attempt to roll towards Sgt. Mcelroy and refused to place his hands behind his back and was again drive stunned.  After the second drive stun Sanchez then placed his hands behind his back and complied and we were then able to safely place Sanchez into

-4-

handcuffs.  Once secured Sanchez was rolled over and was bleeding from a laceration over his left eye.

*Cty. Defts' Ex.* A-3 at 23; *see also Cty. Defts' Ex.* A-3 at 24 (report of Deputy Banta); *Cty. Defts'*

*Ex.* A-3 at 25 (report of Deputy Hale).

Lieutenant Darner then arrived and:

asked for several of the deputies to step out and I observed Inmate Sanchez on the cell floor, handcuffed and he had what appeared to be an laceration above his left eye.  I asked the deputies to give the inmate some room and to place him in the center of the cell floor so I could assess his injuries.  I noticed a small amount of blood on a stool seat and a large portion on the floor around Inmate Sanchez.  I immediately asked for the nurse to again meet with us and look at his laceration. At this time Inmate Sanchez was compliant enough to follow simple instructions so I informed the deputies to go back to their assigned post to continue locking down the Jail for the night.  It was determined by the nurse to have inmate Sanchez taken to the hospital for possible stitches and he was also checked for other injuries.  He was able to stand and answer questions so we escorted him to pod control after we dressed his wound with a temporary butterfly bandage. Inmate Sanchez was taken to booking, dressed out in another set of clothes and given the opportunity to wash off his hands and face.  After he was placed in a booking chair and transport was notified to take him to the hospital.

*Cty. Defts' Ex.* A-3 at 12.  Plaintiff contends these reports are inaccurate.  *Resp.* at ¶¶ 17-19.

Plaintiff testified that on the way to E-pod, the deputies kept taunting him and provoking

him.  *Cty. Defts. Ex.* B at 28.  They were saying things similar to: "You think you are tough?"

*Id.* at 29.  Plaintiff states he complied with their orders to get to his knees and put his hands on

the wall once he was uncuffed.  *Id.*  When he had done that, Plaintiff testified Sergeant McElroy

came in and attacked him.  *Id.*  Sergeant McElroy started talking saying "is that it, is that all you

have."  *Id.* at 30; *see also Resp.* ("is that it, you don't press charges we don't press charges, and

is that it").  Because he could not hear well out of his right ear, Plaintiff testified he "tried to turn

to my left to see what he was trying to tell me and everything but that's when he attacked me."

-5-

*Cty. Defts' Ex.* B at 30; *see also Resp.* at ¶ 14 ("I only turned my head").  Plaintiff stated they just started swinging.  *Cty. Defts' Ex.* B at 31.  Plaintiff testified they were not even trying to put him back in cuffs.  *Id.*  Plaintiff tried to defend himself by covering his face.  *Id.*  He also tried to put his hands underneath him but was not successful.  *Id.*

Plaintiff testified he was hit an unknown number of times by Defendants' fists and someone kicked him with a boot in the face.  *Cty. Defts' Ex.* B at 32.  Plaintiff believes he blacked out for a period of time.  *Cty. Defts. Ex.* B at 32.  He testified he woke up in a puddle of blood.  *Id.*  The blood was coming from a cut on his upper lip and one by his left eye.  *Id.*  When he came to, he was in cuffs and the nurse was there checking him out.  *Id.* at 35.

Plaintiff believes there were five or six deputies in the cell but only Sergeant McElroy, Deputy Kelley, and Corporal Scott were involved in the use of force against him.  *Cty. Defts' Ex.* B at 34.  In his summary judgment response, Plaintiff has identified for the first time the John Doe Deputy as Deputy Banta.

The video provided by Defendants, *Cty. Defts' Ex.* A-4,[4] shows Plaintiff being led into E102 with an officer on each side holding his arms.  *Id.* at Pod E102-B.  Plaintiff had no visible injuries.  *Id.*  Three other officers are following behind.  *Id.*  A deputy who was already in the pod joined.  *Id.*  Plaintiff is not struggling or resisting in anyway.  *Id.*  Plaintiff is led up the stairs and taken into a cell.  *Id.*  Plaintiff and all six deputies enter the cell.  *Id.*  From that point, very little is visible on the video.  *Id.*  One officer can be seen drawing his arm back with his fist closed and

---

[4]The video actually consists of video taken from five separate cameras: one in the hallway leading to E pod; two in the pod from separate views labeled A & B; and two in pod control from separate views labeled A & B.

dropping it down a number of times. *Id.* Other than that, all that can be seen is what appears to be rapid movement occurring in the cell and the backs of the deputies closest to the door. *Id.*

After four or five minutes, deputies begin to leave the cell. *Cty. Defts' Ex.* A-4, Pod E102-B. The nurse enters the pod and goes into the cell. *Id.* After a period of time, Plaintiff is led from the cell and down the stairs. *Id.* He has what appears to be white gauze wrapped around his head and there is what appears to be blood on his shirt and pants. *Id.*

Approximately thirty to forty minutes after the incident, Plaintiff was transported to Mercy Hospital Northwest in Rogers, Arkansas. *Cty. Defts' Ex.* B at 36. Plaintiff testified he was in pain in his ribs, his whole left side of his face, his head, and his right ear. *Id.* He had bruises all over his head and body. *Id.* at 37.

Plaintiff was given stitches over his left eye. *Cty. Defts' Ex.* B. He was told he had a blood clot behind his right ear. *Id.* at 37. Plaintiff believes this is what was causing the loss of hearing in his ear. *Id.* at 37. He testified that after the beating he lost the hearing in his right ear and there is no treatment for it. *Id.* at 38. However, he has been told he should see a specialist when released from incarceration. *Resp.* at ¶ 35.

They took x-rays of his left hip but did not find any injury. *Cty. Defts' Ex.* B at 39. He was told the pain was from the beating and given pain pills for that. *Id.* An x-ray of Plaintiff's right chest showed a "[n]ondisplaced fracture anterolateral right seventh rib." *Ray's Ex.* 1A at 2. When he was returned to the detention center and walked to a holding cell, Plaintiff states Sergeant McElroy said: "I had fun." *Resp.* at ¶ 16.

Due to the rib injury, Plaintiff was issued a medical mat until February 4, 2016. *Cty. Defts' Ex.* A-1 at 11. According to Defendants, a medical mat is approximately two inches thick

-7-

and provides more cushion than the mats routinely provided for inmates. However, Plaintiff asserts it is a "security mat" and not a "medical mat" and adequate cushioning is not provided. *Resp.* at ¶ 44.

The BCDC use of force policy provides that "[j]ail personnel will use only that force and restraint necessary to control an inmate who displays violent or threatening behavior." *Cty. Defts. Ex.* A-5 at 7. The policy states that "[p]hysical force and restraints shall be used as a last resort. Jail staff shall use the proper escalation of force starting with the lowest level appropriate for the situation." *Id.* The levels of force are verbal persuasion, verbal warnings, show of force, and hand controls. *Id.* With respect to the use of hand controls, the policy provides "the officer shall attempt to use physical holds designed to gain control of the inmate. No blows shall be struck by the officer unless the resisting inmate becomes an attacker." *Id.* Plaintiff testified he believed the County Defendants violated this policy. *Cty. Defts' Ex.* B at 47 & 49.

On December 31, 2015, Plaintiff was charged with disciplinary violations for assault and battery or accessory to battery or extortion and refusing to obey a deputy's lawful order. *Cty. Defts' Ex.* A-3 at 10. He was found guilty and given thirty days in disciplinary segregation with loss of commissary, games, telephone privileges, and visitation. *Id.* at 13.

On January 1, 2016, Plaintiff was given a prescription for Tylenol for ten days. *Ray Ex.* at 1B at 1-2. This was followed by a prescription for naproxen for two weeks. *Id.* at 2. On January 5, 2016, Plaintiff submitted a request stating he could hear nothing out of his right ear and his rib was broken so he needed to lay on a mat. *Cty. Defts' Ex.* at 20. He was told to submit a medical request. *Id.* He submitted two medical requests that same day asking to see the doctor. *Id.* at 21-22. On January 8, 2016, Plaintiff's stitches were removed. *Ray Ex.* at 1D.

-8-

In disciplinary segregation, jail policy limits the number of hours a day that an inmate can have a mat. Generally, inmates are allowed the use of medical mats during the evening for purposes of sleeping. Plaintiff felt like he was not getting the proper treatment because his mat was being taken away for sixteen hours per day.

When he asked security about having the mat during the day, Plaintiff indicates he was told to ask medical staff. *Cty. Defts' Ex.* A-2 at 24. When he asked medical staff, he was told that when he was on lock down he followed "lock down regulations even with a special mat." *Id.*

With respect to Captain Guyll, Plaintiff testified that he wrote a grievance attempting to get him to approve the medical mat for use during the day time. *Cty. Defts' Ex.* B at 42. Plaintiff felt like he was being given the run around when he asked to have the medical mat during the day. *Id.* When he asked one, he would be told to contact the other. Plaintiff does not contend Captain Guyll was involved in any way in the assault. *Resp.* at ¶ 1.

He asked detention personnel again on January 11, 2016, to be able to keep his medical mat during the day. *Cty. Defts' Ex.* A-2 at 25. In response, he was told medical decisions were made by medical staff. *Id.* "If medical staff feels as though you need to keep your mat during the day, for medical reasons, they will inform jail staff of that and we will accommodate accordingly." *Id.*

Plaintiff asked medical staff again on January 15, 2016, if they could get security to let him have his mat all day. *Cty. Defts' Ex.* A-2 at 32. Medical staff responded that while he was on lock down "medical follows along with the protocols. No mat all day until you[r] lock down is up." *Id.*

-9-

On January 17, 2016, Plaintiff asked again abut keeping the medical mat all day.  *Cty. Defts' Ex.* A-2 at 38.  He also noted that he still could not hear out of his right ear.  *Id.*  Medical staff responded that the doctor had reviewed Plaintiff's x-rays and hospital notes and had not suggested any other treatment.  *Id.*  He was again told that when he was on lock down he had to "follow the lock down regulations which includes not getting a mat all day."  *Id.*

Plaintiff's claim against Nurse Ray is based on the fact that he was not approved to have the mat twenty-four hours a day.  *Cty. Defts' Ex.* B at 45; *Resp.* at ¶ 41.  Plaintiff believes his rib did not heal properly because he did not have the mat during the day.  *Cty. Defts' Ex.* B at 51. He testified he continues to have pain at the bottom of his ribs when he works out, moves forcefully, or lays on his side a lot.  *Id.* at 51-52; *see also Resp.* at ¶ 43 (unable to heal on concrete and steel).

On January 18, 2016, Plaintiff said again he was concerned about his test results and that he may have lost permanent hearing in his right ear.  *Cty. Defts' Ex.* A-2 at 41.  He was advised that Dr. Saez reviewed the medical chart from Mercy and had "no concerns at this time."  *Id.*

### 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that

-10-

a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id.</u> (citing, <u>Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

### (A). Nurse Tyranny Ray's Motion for Summary Judgment

Nurse Ray moves for summary judgment on the grounds that the facts taken in the light most favorable to the Plaintiff do not rise to the level of a constitutional violation.[5] The Eighth Amendment's prohibition against cruel and unusual punishment establishes the "government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976)(internal quotation marks and citation omitted). "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." <u>Robinson v. Hager</u>, 292 F.3d 560, 563 (8th Cir. 2002)(citing <u>Estelle</u>, 429 U.S. at 104).

---

[5] The official capacity claim against Nurse Ray was dismissed by Opinion and Order (Doc. 20) entered on June 20, 2016.

-11-

In order to succeed on a denial of medical care claim, an inmate must show both that he had an objectively serious medical need and that the defendant was deliberately indifferent to that need. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)(citations omitted). "A medical need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006)(citation omitted). "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)(citation omitted). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992).

Here, Plaintiff merely disagrees with Nurse Ray's determination that there was no medical need for Plaintiff to have a medical mat twenty-four hours a day. As no medical needs existed, she advised him that he had to follow the applicable disciplinary segregation rules. Nurse Ray is entitled to summary judgment in her favor. There is no genuine issue of material fact as to whether her conduct so deviated from the applicable standard of care so as to evidence deliberate indifference. McRaven v. Sanders, 577 F.3d 974, 983 (8th Cir. 2009)(neither negligent misdiagnosis or medical malpractice states a cognizable claim); cf. Green v. Ross, No. 09-20540, 2010 WL 3452809, *2 (5th Cir. Sept. 2, 2010)(affirming grant of summary judgment on inmate's claim against nurse for not allowing him an extra mat when he had a broken rib, as there was no

evidence that the nurse's actions constituted more than negligence or that inmate suffered any injury).

**(B).  The County Defendants' Motion for Summary Judgment**

The County Defendants have moved for summary judgment arguing: (1) there is no proof of any personal involvement by Captain Guyll; (2) the force used against Plaintiff was reasonable in light of the circumstances; (3) they are entitled to qualified immunity; and (4) there is no proof of any official capacity liability.

**Claim Against Captain Guyll**

Plaintiff does not assert an excessive force claim against Captain Guyll.  Rather, he asserts a claim against Captain Guyll based on the responses he made to Plaintiff's requests to retain his medical mat during the day.  No constitutional claim is stated based on Captain Guyll's grievance responses.  Blagman v. White, 112 F. Supp. 2d 534 (E.D. Va. 2000)(refusal to entertain or respond to grievances does not compromise the inmate's constitutional rights).  Further, Captain Guyll did not make any decisions regarding the Plaintiff's medical care; rather, he referred the Plaintiff to the medical staff who saw no need for Plaintiff to retain his mat during the day.  Captain Guyll is entitled to summary judgment.

**Excessive Force**

The law is clear that a pretrial detainee cannot be punished.[6]  See e.g. Bell v. Wolfish, 441 U.S. 520, 535 (1979).  "However, not every disability imposed during pretrial detention

---

[6]In Defendants' brief, they contend that although Plaintiff was being held on pending federal charges he had plead guilty to a parole violation and therefore was in convicted status.  Doc. 49 at 5.  However, Defendants then use a combination of the standards applicable to a convicted inmate and a pretrial detainee in making their arguments.  Id. at 5 (applying convicted malicious and sadistic standard to their arguments) & 7 (applying pretrial detainee objective reasonableness standard to their arguments).  As, there is no indication Plaintiff was sentenced on the parole revocation charge, and he was being held on pending federal charges, we will treat Plaintiff as a pretrial detainee.

-13-

amounts to 'punishment' in the constitutional sense." <u>Smith v. Copeland</u>, 87 F.3d 265, 268 (8th Cir. 1996); <u>see also May v. Sheahan</u>, 226 F.3d 876, 884 (7th Cir. 2000) ("The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that served to punish a pre-trial detainee").

The Supreme Court held that a pretrial detainee need only show that an officer's use of force was objectively unreasonable to prevail on an excessive force claim. <u>Kingsley v. Hendrickson</u>, et al, ___ U.S. ____, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). The determination should be made:

> from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979)). In determining whether a given use of force was reasonable or excessive, the Court said the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force. *Id*.

Viewing the evidence in the light most favorable to the Plaintiff, I believe there is a genuine issue of material fact as to whether the amount of force used was objectively unreasonable. Plaintiff was showing no signs of resistance during his entry into the pod and

-14-

walk upstairs to the cell. He was handcuffed when he entered the cell accompanied by six deputies. No other inmates were present in the cell. The video does not show how the altercation inside the cell started or what actions were taken by the Plaintiff or the Defendants. The court is left with conflicting stories of what occurred in the cell. It is obvious that Plaintiff sustained injuries during the altercation severe enough to require him to be sent to the hospital. On summary judgment motion, we are not free to adopt one parties' version of the events over that of another parties. There are genuine issues of material fact that preclude the entry of summary judgment in favor of Defendants Sergeant McElroy, Deputy Kelley and Corporal Scott on this claim.

### Qualified Immunity

Defendants also maintain they are entitled to qualified immunity. Qualified immunity "is an *immunity from suit* rather than merely a defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original). It "is a means of protecting government officials from vexatious lawsuits questioning the discretionary performance of their duties." Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989).

Analyzing a claim of qualified immunity requires a two-step inquiry. Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Robinson v. Payton, 791 F.3d 824, 828 (8th Cir. 2015). "Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity." Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009). At the summary judgment phase, a district court

AO72A
(Rev. 8/82)

is required to view the genuinely disputed facts in the light most favorable to the non-moving party, provided the record does not so contradict the facts as to render so viewing them unacceptable to any reasonable juror. O'Neil v. City of Iowa City, 496 F.3d 915, 917 (8th Cir. 2007).

Defendants are not entitled to qualified immunity. The parties dispute how much force was used and the record does not conclusively support either narrative. The dispute is purely factual. The facts as alleged by the Plaintiff, establish a violation of Plaintiff's constitutional rights.

Second, "[w]hether the law is clearly established depends on what would be apparent in each situation. 'Where an officer could be expected to know that certain conduct would violate statutory or constitutional rights, *he should be made to hesitate.*'" Johnson-El, 878 F.2d at 1049 (emphasis in original). The right must be defined "in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001). "[T]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)(citation and internal quotation marks omitted).

The law was clearly established that force could not be used against non-aggressive pretrial detainees for the purpose of punishing them. Edwards, 750 F.3d at 732 (alleged violation occurred in 2010). Further, it is was clearly established that the amount of force that may be used is largely dependent on the inmate's conduct. See e.g, Thompson v. Zimmerman, 350 F.3d 734, 735 (8th Cir. 2003)(clearly established at the time that jailers entered the cell and used force against a detainee, that it was not objectively reasonable to use force against a detainee who was

-16-

merely sitting down, with his hands on his legs, looking down).  If the detainee was not being physically aggressive or physically resisting, the amount of force should be no more than necessary to transfer the inmate.  Id.  If the conduct was as Plaintiff testified, Defendants would be liable for transgressing existing precedent.  Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014).

**Official Capacity Liability**

"Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." Bolcerson v. City of Wentzville, Missouri, 840 F.3d 982, 985 (8th Cir. 2016)(citation omitted).  Plaintiff has not pointed to any custom, policy, or practice that was the moving force behind the alleged constitutional violations; rather, he testified he believed the Defendants violated the use of force policy.  There is no evidence in the summary judgment record that could support a conclusion that Benton County is liable.  The Defendants are entitled to summary judgment on all official capacity claims.

**4.  Conclusion**

For the reasons stated, I recommend as follows:

(1) the motion for summary judgment (Doc. 45) filed by Nurse Tyranny Ray be **GRANTED** and the claims against her dismissed with prejudice;

(2) the motion for summary judgment (Doc. 48) filed on behalf of Sergeant McElroy, Deputy Kelley, Corporal Scott, and Captain Guyll be **GRANTED IN PART AND DENIED IN PART.**  Specifically, the motion should be granted with respect to Captain Guyll and all claims

-17-

against him be dismissed with prejudice.  The motion should be denied with respect to Sergeant McElroy, Deputy Kelley, and Corporal Scott and those claims set for jury trial; and

(3) Plaintiff should be afforded the opportunity to substitute Deputy Banta in place of the John Doe Deputy and the complaint served on him.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of July 2017.


/s/ *Erin L. Wiedemann*
_____
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

-18-